Paul EAGLE,
Employee-Appellant-Respondent,

v.

CITY OF ST. JAMES,
Employer-Respondent-Cross-Appellant,

Bituminous Casualty Corporation,
Insurer-Cross-Appellant.

Nos. 13345, 13346.

Missouri Court of Appeals,
Southern District,
Division One.

March 13, 1984.

Nile D. Griffiths, Jack Randall, Inc., St. Louis, for employee-appellant-respondent.

Frank J. Lahey, Jr., Graff & Lahey, St. Louis, for employer-respondent and employer and insurer cross-appellants.

TITUS, Judge.

Paul Eagle (Eagle) on February 27, 1976, was regularly employed by the State of Missouri. At the same time he was also engaged in part time work for the City of St. James with the title of Assistant Chief of the Auxiliary Police. On the night of the date in question, supra, Eagle worked as an auxiliary police officer at a high school basketball game in St. James. At the conclusion of the game the ranking regular police officer on duty, Lt. Phillips, picked up Eagle in a St. James police car. While en route to the police station, Lt. Phillips and Eagle heard a call on the State Highway Patrol network radio concerning a shooting outside the city limits of St. James and learned the patrolman dispatched to investigate the matter did not know how to get to the place of occurrence. Lt. Phillips radioed his dispatcher to contact the highway patrol and tell them he had a man in his car who could direct the patrolman to the scene. When the vehicles driven by Lt. Phillips and the trooper met, Lt. Phillips told Eagle to go with the patrolman and show him how to get to his desired destination because "auxiliary police officers of St. James were expected as part of their duties to cooperate with the state

police." Eagle and the trooper departed in the patrol car. When it neared the city limits, the driver-patrolman lost control of the vehicle which went into a ditch and came to a halt some 70 feet outside the boundary of St. James. Because of injuries received, Eagle filed his claim for workers' compensation benefits against the city and its carrier per Ch. 287 [1]. Following trial on July 31, 1978, the chief administrative law judge issued an award in Eagle's favor. All parties filed applications for review and, following modification of the initial award by the Labor and Industrial Relations Commission (commission), both sides appealed to the Circuit Court of Phelps County. The latter tribunal affirmed in part and reversed in part the award of the commission and all parties appealed to this court.

We first consider the point relied on by the city and its insurer that the commission and the court nisi erred in ruling that at the time of the accident Eagle was an employee of the city rather than the highway patrol because at the time of the casualty Eagle was under the control and direction of the patrol as a loaned or borrowed employee and, therefore, the patrol and its carrier were solely liable for compensation benefits due Eagle.

■■■ Essential elements constituting a loaned or borrowed servant relationship are: (1) a consent on the part of the employee to work for the special employer; (2) actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract to do so; and (3) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue. *Ballard v. Leonard Brothers Transport Co., Inc.,* 506 S.W.2d 346, 350[2] (Mo.1974). "[E]ach of the three elements of the borrowed servant relationship, as set forth in *Ballard,* supra, must be shown" [*Crain v. Webster Elec. Cooperative,* 568 S.W.2d 781, 789 (Mo.App.1978)] and as to the first element, consent on the part of the

employee cannot be inferred merely from the fact the employee obeyed the commands of his master in entering the services of another. *Andra v. St. Louis Fire Door Company,* 287 S.W.2d 816, 821 (Mo. 1956).

An exceptional collection and critique of reported cases dealing with the existence vel non of the borrowed servant relationship exists in *Crain,* supra, 568 S.W.2d at 788–792. We shy from any efforts at plagiarizing the writings of Flanigan, J., or in attempting to summarize his efforts. This writer can only emphasize that a reading of that opinion is a "must" for anyone dealing with the problems at hand.

■■■ Eagle's association with the patrolman was in obedience to the direction of Lt. Phillips, his superior officer, to accompany the patrolman for the sole purpose of directing him to the desired destination. We do not perceive that such an undertaking on Eagle's part in conformance with the command of Lt. Phillips, demonstrated a consent on the part of Eagle to work for the highway patrol. Neither did merely directing the trooper to the correct route constitute an entry by Eagle into the usual and actual work of or for the highway patrol pursuant to an express or implied contract to do so. Moreover, Eagle's sole function and limited task of giving the patrolman directions did not demonstrate an existence of power within the trooper to control the details of the direction-giving or the right to determine how such will be performed, commenced, continued or terminated. The duration of the ordered one-time relationship between Eagle and the patrolman would not have exceeded but several minutes in time even had the mission been completed. Although the formula in *Ballard,* supra, does not require that the relation between the employee and the special employer exist for any certain length of time before it blooms into a borrowed servant relationship, as noted in *Crain,* supra, at 791[10] "the courts almost invariably have pointed out how long the

---

1. Statutory and rule references are to RSMo    1969, and V.A.M.R.

relationship had existed and it appears that its duration is an evidentiary factor which may be taken into consideration in determining whether or not the three elements set forth in *Ballard* have been shown." Eagle's limited one-time association with the trooper in compliance with the order and direction of his superior police officer simply constituted an accommodation to the patrolman rather than a consent by Eagle to enter into the actual and usual work of the highway patrol. The evidence was sufficient to support the finding that Eagle was not a loaned or borrowed servant in the employ of the patrol but rather was an employee of the City of St. James at the time of the casualty. We deny the point relied on.

The chief administrative law judge, concerning the compensation rate, ruled that Eagle was "entitled to the minimum compensation rate of $16 per week [§§ 287.170 and 287.190] in that he was working for the employer one year preceding the accident, however, the wages (if any) were minimal." The commission, affirmed by the circuit court, found per § 287.250(6) that Eagle's compensation rate was $76.72 per week. The city and its insurer claim the latter finding was in error.

As an auxiliary police officer, and those of like ilk, Eagle was theoretically paid $1.00 per month for attending a monthly meeting and training session. Eagle and the other auxiliary officers were required, without pay, to volunteer eight hours of service each month to maintain their status. We say the auxiliary officers were "theoretically" paid $1.00 per month because, in fact, no such payments were made to such officers. Rather, the theoretical payments were actually put into a special fund by the regular police department to provide uniforms for the auxiliary officers when needed. Each auxiliary policeman was required to furnish his own gun and blackjack.

■ The proper method to employ in determining the wage base and compensation rate under § 287.250 is to commence with the first subsection thereof and then descend in numerical order under the other subsections until the wage rate provision is found which applies to the particular facts of the case. *Glazebrook v. Hazelwood School District*, 498 S.W.2d 823, 826[2] (Mo.App.1973); *Cross v. Crabtree*, 364 S.W.2d 61, 67[9] (Mo.App.1962). We are admonished by § 287.800 that the provisions of the workers' compensation law "shall be liberally construed with a view to the public welfare." The rule that all doubts should be resolved in favor of the worker is applicable to questions concerning the amount of compensation to be awarded in the computation of the wage base. *Baer v. City of Brookfield*, 366 S.W.2d 469, 471[6, 7] (Mo.App.1963). Nevertheless, the rule of liberal construction does not permit the allowance of a compensation claim that lacks some of the essential elements required by the act. *Mershon v. Missouri Public Service Corp.*, 359 Mo. 257, 260, 221 S.W.2d 165, 167[1] (1949).

■ Under § 287.250(1) computation of compensation is based on "the annual earnings which the injured person received ... if in the employment of the same employer *continuously* during the year next preceding the injury." (Emphasis supplied.) As noted, Eagle worked gratis for the city eight hours a month and attended one monthly training session for which he "theoretically" was paid but $1.00. Under such circumstances it cannot be held that Eagle was "continuously" employed by the city during the year preceding the injury as required by subsection (1). Consequently that subsection is inapplicable.

■ Subsection (2) is confined to definition. Ergo we pass to subsection (3). This subsection applies to those who accept employment normally requiring full year services but who are injured prior to the expiration of a year after initial hiring. Since, as noted under subsection (1), supra, Eagle was not in an employment by the city requiring full year service, he may not be properly classified under subsection (3).

■ Subsection (4) explicitly applies to "employments in which it is the custom to operate throughout the working days of the year." Under subsection (2) the employment of the injured employee means the grade in which such an employee was employed. The grade of Eagle's employment was obviously outside the provisions of subsection (4) because it was not the custom of the employment in which Eagle was engaged as an auxiliary police officer to operate throughout the working days of the year.

■ Subsection (5) applies "to employees in employments in which it is the custom to operate for a part of the whole number of working days in each year." Eagle's employment was not for a part of the whole number of working days per year because he had no fixed or exact periods of employment nor were the monthly eight hours of voluntary services performed in any one contiguous working period but rather at odd or sporadic periods of duty.

■ As previously observed, the commission and the court nisi found that subsection (6) applies and we agree. The subsection states:

"In the case of injured employees who earn either no wage or less than the earnings of adult day laborers in the line of employment in that locality, the yearly wage shall be reckoned according to the average annual earnings of adults of the same class in the same (or if that is impracticable then of neighboring) employments;"

Eagle was paid no wages. Therefore, his yearly wage for compensation purposes was to be ascertained from the annual earning of adults in the same employment in which he was working when injured. The undisputed evidence was that police officers regularly employed by the city were paid $500 a month or $6,000 per year. When the annual pay is divided by the 365 days in a year, the daily wage rate amounts to $16.44. Multiplying the daily rate by seven gives a weekly rate of $115.08. Two-thirds of the weekly earnings (§ 287.160–2) makes a compensation rate of $76.72, which is exactly what the commission awarded and the court approved. We find the facts in the instant case most similar to those in *Stegeman v. St. Francis Xavier Parish*, 611 S.W.2d 204, 209–210 (Mo. banc 1981). In *Stegeman* the claimant was injured while performing volunteer work in the construction of a gymnasium for a parish school. In that case, as in the present one, the volunteer injured employee earned no wages and it was determined that subsection (6) was applicable. The same finding in our cause was not error.

For the permanent partial disabilities sustained by Eagle as a result of his accident injuries, the commission, affirmed by the court nisi, made the following award.

| | |
|---|---|
| 75% right shoulder x 232 weeks | = 174 weeks |
| 10% right knee x 160 weeks | = 16 weeks |
| 5% body as a whole for concussion syndrome | = 20 weeks |
| | 210 weeks |
| 10% additional award for multiplicity of injuries | = 21 weeks |
| Total Permanent and Partial Disability | = 231 weeks |

In their final point relied on as appellants, the city and its insurer say the commission and the trial court erred in the above computation as to permanent partial disability "in that there is no provision in the ... law for the allowance of additional compensation for permanent disability for multiple injuries; there being no competent and substantial evidence to support such an award, the same must be reversed." We are uncertain if the city and its carrier are relying on a contention that the law simply does not permit any award for multiple injuries or whether they acknowledge such an award may be proper under certain circumstances but should not have been allowed in the instant case because there was no competent and substantial evidence to support same. In either event the point does violence to Rule 84.04(d) because it nowhere undertakes to elucidate "wherein and why" such an award is not permitted or "wherein and why" there was insufficient evidence to support such an award.

To this point the city and its insurer cite § 287.190, *Williams v. Nieman Marcus*, 652 S.W.2d 893, 894 (Mo. App.1983), *Martin v. Star Cooler Corp.*, 484 S.W.2d 32, 35 (Mo.App.1972) and *Blair v. Associated Grocers, Inc.*, 593 S.W.2d 650, 655 (Mo.App.1980). *Williams* at p. 894[2], inter alia, held the commission has no more authority than that granted to it by statute. No one dare argue with such an obvious truism but how this bolsters the point is not shown. We also find nothing in *Martin* or *Blair* germane to or in any way supportive of the point. Under § 287.-190–3 the commission may provide for "permanent injuries other than those specified in the schedule of losses" [§ 287.-190(1)] and we see nothing in the statute which prohibits a special or additional allowance for cumulative disabilities resulting from a multiplicity of injuries. Where, as here, appellants cite irrelevant authority in support of a point relied on, it is tantamount to a point being presented naked of citations, indicating there is no authority for the assertion or assertions and constitutes an abandonment thereof. *Cox v. Blackwell*, 661 S.W.2d 831, 832–833[2] (Mo. App.1983); *Bishop v. Bishop*, 618 S.W.2d 261, 263[1, 2 and 4] (Mo.App.1981); Rule 84.04(d). The concluding point of the city and its insurer is denied.

The commission awarded Eagle total compensation in the sum of $29,624.18 to cover incurred medical expenses and to compensate for temporary total and permanent partial disabilities and disfigurement. It found Eagle's gross recovery against the negligent third party was $42,000 [which was paid on June 14, 1977, or before the compensation claim was heard and decided by the chief administrative law judge on October 18, 1978] and that his net recovery from the third party, after payment of attorney fees and expenses, was $28,000. However, the commission opined and held that the employer and insurer must pay "the award" of compensation before they are entitled to any credit for subrogation. It then resorted to the following computation to determine the net legal liability of the city and its insurer to Eagle:

$$\frac{\text{Compensation liability} \quad \$29,624.18}{\text{Gross 3d party recovery} \quad \$42,000.00} = .7053376 \times \$28,000 = \$19,749.45$$

From this equation the commission opined and held that subtracting $19,749.45, the employer's and insurer's share of the net recovery, from the total compensation due, $29,624.18, the net liability of the city and insurer to Eagle was $9,974.73.[2] Apparently the equation, supra, was employed to permit the employer and insurer a credit of only 70.53376% on the net settlement of $28,000 paid to Eagle because of their failure to pay a nonexistent award.

The circuit court reversed the award of the commission for only allowing the employer and insurer a percentage of the total net amount of the recovery effected in the third-party settlement. It opined that the city and its insurer were entitled to a full credit of the entire total net amount of $28,000 received in the settlement with the third-party and were not to be denied such credit because they defended the claim on credible grounds. Eagle says this was error. We disagree.

Section 287.150–3 provides that when the employee effects a settlement with the third person, the employer shall pay from his share of the recovery a proportionate share of the expenses of the recovery, including a reasonable attorney fee, and that any part of the net recovery, after deducting expenses and fees, paid to the employee shall be treated as an advance payment by the employer on account of any future installments of compensation. In the instant cause, the third party's $42,-000 settlement check was made payable to Eagle et uxor and the worker's compensation insurance carrier for the city-employer.

---

**2.** We note that this amount should have been $9,874.73, although this computation error is of no consequence, given our disposition of this point.

The carrier promptly endorsed the draft so that the entire settlement proceeds went to Eagle. This endorsement made it unnecessary to compute separately either the employee's or the compensation carrier's liabilities for attorney fees and expenses because those were satisfied forthwith when the attorney was paid his fees and expenses of $14,000 and the employee received the full balance of $28,000. We agree with the circuit court that whether or not the employer and insurer had made any payment under the compensation law at the time the third-party recovery was effected, they may, per § 287.150–3, share in the settlement proceeds or if all is paid to the employee, have that treated as an advance payment on account of future installments of compensation. Of course, the employee should be entitled to future compensation benefits in the event the amount paid him as an advance is exhausted under the provisions of the statute. *Ruediger v. Kallmeyer Brothers Service,* 501 S.W.2d 56, 59[1, 2] (Mo. banc 1973); *St. Louis Bd. of Educ. v. Shannon,* 640 S.W.2d 121, 122[5] (Mo. banc 1982). Having found, as did the commission, that the total compensation due Eagle was $29,624.18, the court nisi, after crediting the $28,000 advance payment, calculated the balance due Eagle was the sum of $1,624.18. Employee's first point relied on is denied.

In toto, the second point relied on by employee in his appeal to this court reads: "The decision of the Circuit Court of the County of Phelps giving the employer and insurer credit for monies paid to Paul Eagle's wife for loss of consortium, finding a credit of Twenty-Eight Thousand Dollars ($28,000.00), and computing the credit is erroneous as a matter of law, is not supported by the facts found by the commission and is not supported by sufficient competent evidence in the record.

*Kroeker v. State Farm Mutual Automobile Insurance Company,* 466 S.W.2d 103,[3] Subrogation is governed by principles of equity; it rests on the principle that substantial justice should be obtained regardless of form.

*Cole v. Morris,* 409 S.W.2d 688, ([Mo.] 1966)[4] Employer's right of subrogation is based upon employer's legal obligation to pay compensation for the injury.

Section 287.280 and *Mays v. Williams,* 494 S.W.2d 289 [ (Mo.1973) ], a purpose of their [sic] Worker's Compensation Law in Missouri is to see that worker's compensation payments are made when due."

As any apt reader can detect, this point is written in utter disregard of the mandates of Rule 84.04(d). Contrary to the demands of the rule [*Pickett v. Stockard,* 605 S.W.2d 196, 197[2] (Mo.App.1980) ], "wherein and why" computation of the credit was erroneous as a matter of law, "wherein and why" the computation is not supported by the found facts and "wherein and why" the computation is not supported by sufficient competent record evidence is left to guess, surmise, speculation and conjecture. Under the rule it is not enough for a point to merely claim that the action of the court nisi was erroneous as a matter of law or was not supported by the found facts or competent evidence. Some testimony or evidence must be stated in the point relied on which isolates and lends support to the conclusions before it can be said the point was written in compliance with the rule. *Empire Gas Corp. v. Small's LP Gas Co.,* 637 S.W.2d 239, 245[7] (Mo.App.1982); *In re Estate of Sifferman,* 603 S.W.2d 30, 31[1] (Mo.App. 1980). The three cases cited to the point, supra, voice the general principles attributed to them by Eagle. Section 287.280, cited by Eagle, concerns the obligation of every employer to insure his liability under the act unless he can qualify as a self-insurer. It is beyond our comprehension how any of the cited authorities are thought to support the stark conclusions stated in the point relied on. The dearth of citations of relevant authority for the alleged point of error justifies this court to

**3.** The correct citation for *Kroeker* is 466 S.W.2d 105 (Mo.App.1971).

**4.** The correct citation for *Cole* is 409 S.W.2d 668.

consider the point abandoned. *Winsor v. Continental Fabricators & Supplies,* 641 S.W.2d 120, 124 (Mo.App.1982). Employee's second point relied on is denied.

In his third and last numbered point relied on, Eagle says the circuit court's denial of "future medical care is erroneous as a matter of law, is not supported by the facts found by the commission and is not supported by sufficient competent evidence in the record." The only citation of authority to this point is § 287.140 which outlines the employer's obligation for providing medical treatment. What has just been said about the employee's second point as penned in violation of 84.04(d) is equally applicable to the third point relied on. In the argument portion of Eagle's brief as it relates to all three points relied on, there is not a single reference to the legal file or the transcript. This, especially as it relates to the nine-line argument in Eagle's brief anent his third point, is a patent violation of Rule 84.04(h) which requires the "argument shall have specific page references to the legal file or the transcript."

The only evidence in the cause anent the need for future medical care was via the deposition testimony of Eagle's examining physician. However, at the conclusion thereof the doctor acknowledged during cross-examination that in the written medical report he rendered concerning his examination of Eagle, he made no mention that the employee was in need of further medical treatment.

 On appeal in workers' compensation cases, this court is bound to review the entire record in the light most favorable to the commission's award. If the award is supported by substantial and competent evidence, we must uphold the decision. The commission, not this court, is charged with the responsibility of passing upon the credibility of the witnesses and has leave to believe or disbelieve all, part or none of the testimony of a witness even though no impeaching or contradictory evidence is introduced. Moreover, the commission's obvious rejection of the opinion testimony of a medical witness, as occurred here, may not be disturbed upon review unless the rejection is against the overwhelming weight of the evidence. *Blissenbach v. General Motors Assembly Div.,* 650 S.W.2d 8, 11[4–6] (Mo.App.1983), and cases there cited. Predicated upon the foregoing, the commission's omission to provide for future medical care for the employee is supported by substantial and competent evidence and is not against the overwhelming weight of the evidence. Employee's third point relied on is denied.

The judgment of the trial court is affirmed.

FLANIGAN, P.J., GREENE, C.J., and CROW, J., concur.